# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

JUAN R. AGUILAR,

           Petitioner,

   vs.

M. S. ADAMS,

           Respondent.

                                   /

CASE NO. CV F 08-01745 LJO BAK HC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS WITH PREJUDICE; DIRECTING CLERK OF COURT TO ENTER JUDGMENT FOR RESPONDENT; DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY**

On October 22, 2008, Juan R. Aguilar ("Petitioner"), a *pro se* California prisoner, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition") in the United States District Court for the Northern District of California ("Northern District").[1] On November 13, 2008, the Northern District transferred the Petition to this Court pursuant to 28 U.S.C. § 2241(d), finding Petitioner's state conviction arose from the Fresno County Superior Court, located within the venue of this Court, and that this Court was the more convenient forum. *See* 28 U.S.C. §§ 84(b), 2241(d). On November 14, 2008, the Court received the Petition.

On January 26, 2009, Anthony Hedgpeth ("Respondent") filed an Answer to the Petition. On February 12, 2009, Petitioner filed a Traverse to the Answer. Thus, this matter is ready for decision.

---

[1]    Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302, the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

1

## PROCEDURAL HISTORY

On November 9, 2006, a Fresno County Superior Court jury convicted Petitioner of willful, deliberate, and premeditated attempted murder (Cal. Penal Code §§ 187, 664). (2 Clerk's Tr. ("CT") 362.) The jury found that in Petitioner's commission of attempted murder, the "principal," Manuel Lopez,[2] was armed with a firearm (Cal. Penal Code § 12022(a)(1)), but that Petitioner did not know that Lopez was personally armed with a firearm (*id.* § 12022(d)). (2 CT 362-63.) The jury also found that Petitioner, in the commission of attempted murder, committed a hate crime (Cal Penal Code § 422.75(a)), and that it was committed in concert with Lopez (*id.* § 422.75(b)). (2 CT 363.) After Petitioner's waiver of jury trial on prior convictions, the trial court found that Petitioner previously suffered a conviction or juvenile adjudication of a "serious" or "violent" felony. (*Id.* 366.) On December 20, 2006, the superior court sentenced Petitioner to life with the possibility of parole plus four years in state prison. (*Id.* 404.)

On January 9, 2007, Petitioner appealed his conviction and sentence to the California Court of Appeal. (2 CT 406.) On April 21, 2008, the court of appeal affirmed the conviction and sentence in a reasoned opinion. (Lodged Doc. ("LD") 4.) On June 2, 2008, Petitioner filed a petition for review in the California Supreme Court, which summarily denied the petition on July 30, 2008. (LD 5-6.)

On November 14, 2008, the Court received the Petition.

## FACTUAL BACKGROUND[3]

Lopez lived with his younger sister, Margarita Lopez ("Margarita"), her infant daughter, their grandmother, and [Petitioner] at a house on East Illinois Avenue in Fresno. [Petitioner] was the father of Margarita's children, and [Petitioner]'s mother also then lived in the house with the Lopezes. The neighborhood was mainly Hispanic, but there were people of other races and ethnicities in the neighborhood as well.

One of these neighbors was Albert Hood, Sr., an African-American male who also lived at a house on East Illinois Avenue, which was about three blocks away from Margarita's house. Hood's girlfriend, Felicia Tobias, had been living with him until the first part of September 2005, when she moved out and went to live with her cousin, Georgina Salazar, at a house that was across the street from Margarita's house. Tobias testified that Hood was still her boyfriend as of September 2005, but that they "were having problems."

---

[2] Petitioner and Manuel Lopez were tried together in a consolidated case. (1 CT 174.)

[3] The Court adopts the factual background from the April 21, 2008, California Court of Appeal opinion on direct review as a fair and accurate summary of the evidence presented at trial. *See* 28 U.S.C. § 2254(e)(1); *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

Hood walked past Salazar's house at least twice a day. In the morning, he would walk past Salazar's house as he walked from his house to an AM/PM store where he would get a ride to work. After work, he would walk home from the same location. He also would walk from his house to Salazar's house to visit Tobias. Margarita often saw Hood making these walks.

Hood testified that, during these walks, he frequently saw two or more young men, including on occasion, [Petitioner and Lopez], hanging out in front of Margarita's house. According to Hood, "If there was one or two of them, they would speak. If there was a gang of them, they would look at me like what you looking at nigger. Don't be looking over here."

The afternoon of September 27, 2005, Lopez was outside with a man Margarita knew only as "Duck." That afternoon, Margarita heard Lopez and Duck make racial comments about Hood. She heard them talking to "some girls across the street." Lopez said to the women, "what's up with all these niggers on the block." Duck then said that "he was gonna handle that shit." Margarita told Lopez "not to start problems at my house." [Petitioner] was not present during the conversation. Margarita later testified that [Petitioner] had Black friends, liked watching BET, and that she had never heard him speaking bad about Black people.

## A.
## Shooting Incident

The jury heard slightly different accounts of the shooting of Hood by Lopez on the night of September 27, 2005, from four witnesses.

**1. Margarita's Testimony**

According to Margarita, at approximately 9:00 p.m. that night, [Petitioner] came home. She tried to tell him what she overheard Lopez and Duck saying that afternoon – that Duck said he was "gonna handle" the fact that there were Blacks on the block – but he did not pay attention to her. Instead, he went outside to talk to a man named Joey. Lopez also was outside, talking to Duck. There were several other men outside at the time. As Margarita watched, Duck took a handgun out of the trunk of his car and gave it to Lopez, who then put it somewhere in his pants. Later, Margarita changed her testimony on this point, stating that [Petitioner] had not gotten home yet when she saw Duck give the gun to Lopez. A short while later, Margarita saw Hood, who was across the street, walking in the direction of Salazar's house. Because the lights were on outside her house, Margarita could easily see it was Hood.

During this time, [Petitioner] and Lopez and the other men were outside Margarita's house. According to Margarita, Hood approached the group of men and said, "What's up then?" Hood and [Petitioner] walked towards one another. Then, without warning, Hood suddenly hit [Petitioner] in the face, causing [Petitioner] to stagger to the side. Margarita said [Petitioner] looked "dazed out."

Immediately after Hood had hit [Petitioner], Lopez fired three shots at Hood. Margarita heard three gunshots. She turned and ran inside. She then turned off all the lights on the house. Lopez, along with several other men, "just jumped in cars and took off." Duck left by himself in his own car.

The police came to Margarita's house about half an hour after the shooting. Margarita said she did not talk to the police at that time because she "didn't want to be involved in nothing." She was interviewed by the police about the incident a couple of days later; during the interview, she told the police that she did not see anything.

**2. Tobias's Testimony**

Tobias was outside in the front yard of Salazar's house at about 10:00 p.m. on the night of September 27, 2005. She saw Hood and his son, Albert Hood, Jr. ("Albert"), walking up the street but before he could get to Salazar's house, three young men approached them: Lopez, [Petitioner], and another man that Tobias did not know. Tobias heard one of the young men say, "[Y]ou didn't get the fucking message. We don't want no fuckin' niggers on this block." Tobias then saw Hood hitting [Petitioner] in the face whereupon "Manuel pulled his gun to shoot" Hood. Tobias claimed she heard "at least

3

six, seven gunshots."

After Hood was shot, Lopez and [Petitioner] and the other man "jumped in their car." Tobias then "directly told them to their faces that" she was going to call the police. Lopez responded that he "didn't give a fuck." Tobias saw Lopez wrap the handgun he was holding in a red bandana as he ran to the car. [Petitioner] drove away in a black Honda sedan; Lopez was in the front passenger seat.

Tobias went to Hood's aid. She dragged him from the street to Salazar's house. After getting Hood into the house, she called 911. Shortly thereafter, police and emergency medical services personnel came to Salazar's house. Tobias testified that when she spoke with the police and made a statement, the incident was still fresh in her mind. According to Tobias, "[w]hat I told [the police officer] back then I can't really remember because it's been a long, long time. But whatever I did say, that was what was the truth."

Tobias also admitted that she had a 2006 felony conviction for evading police officers.

On cross-examination, Lopez's trial counsel stated "I'm gonna have to walk you through your prior statement because it was very different than the statement you gave today." He proceeded to do so, by, for example, pointing out that in her prior statement to police officers (in the police report), Tobias stated that she ran outside Salazar's house after she heard gunshots. However, Lopez's trial counsel was never able to get Tobias to explicitly admit that she never saw the shooting.

### 3. Hood's Testimony

Hood testified that he walked to Salazar's house at about 11:00 p.m. on September 27, 2005. He was going to the house to get Tobias because she had told his son, Albert, that she "wanted to come home" to his house. Hood was accompanied by his son, Albert. Hood was on the north side of the street, across from Margarita's house, because he "didn't want no problems." He had been told by Tobias that "they were gonna beat me up if I walked down the street again." Hood understood "they" to mean Lopez and [Petitioner]. Tobias also told Hood that she had told "them that they couldn't whoop [Hood].... So she said then they said that they would shoot me."

When Hood got to Salazar's house, he talked briefly with Tobias. As they stood outside the house talking, Hood saw "a bunch of cars coming, people getting out and stuff at" Margarita's house. Tobias said she had to gather her clothes before she could go with Hood; he said he would go get his car and come back for her.

Hood and Albert started to walk home. Three young men came up to them. Hood said [Petitioner] was in front of the other two men, one of whom was Lopez. Lopez and the other man were behind [Petitioner] "on each side." Hood said that he had seen Lopez on the porch in front of Margarita's house a couple of times before that night, but they had never spoken. Hood said that he had once talked to [Petitioner] about "hooking up some music in his car or something."

[Petitioner] stopped within two-and-a-half to three feet of Hood. [Petitioner] said, "Hey dog, can I holler at you?" Hood replied, "I ain't no dog, but you can holler all you want." After Hood told his son to step back, [Petitioner] said, "Did you get my message?" Hood said, "[W]hat message?" [Petitioner] said, "We don't want no niggers walking down this street, mainly you." Hood then hit [Petitioner], causing [Petitioner] to fall back.

After hitting [Petitioner], Hood went after the third man while Lopez "fumble[d] for something" in the waistband of his pants. A moment later, Hood "felt something sting [his] arm." Hood told Albert to run because he (Hood) had been shot. Hood turned towards Lopez; Lopez shot Hood again, this time in the chest. Hood then turned and started to run. As he did, Hood was shot in the back. His son "kind of grabbed" him and kept running with him. Hood said he heard five gun shots altogether. The shots were fired in rapid succession.

Hood said they ran into Salazar's house. As he sat on Salazar's couch, Hood heard "cars burning out." He noticed Tobias running out with sticks and a bottle

4

hollering some name. "So [he] told her to get back in. Just call the ambulance[.]"

#### 4. Albert Hood, Jr.'s Testimony

Albert's testimony was consistent with his father's testimony about the shooting incident. However, Albert was not able to positively identify [Petitioner] as the "heavyset" man whom his father punched. Moreover, Albert testified that the heavyset man began saying "Didn't I tell ..." but did not finish before Hood hit the man.

### B.
### Events After The Shooting Incident

An ambulance subsequently came to Salazar's residence and Hood was taken to the hospital, where his injuries were treated. It was stipulated that, if called to testify, Dr. Davis, the physician who had treated Hood at the University Medical Center, would testify as follows:

"Albert Hood was treated by emergency room doctors at University Medical Center at 11:40 p.m. on September 27, 2005. Albert Hood was hit by three bullets resulting in four gunshot wounds to his body. A bullet entered, went through and exited Albert Hood's right arm. Another bullet hit Albert Hood's right chest. Another bullet his [*sic*] Albert Hood's right back. The bullet that hit Albert Hood's right chest caused injury to Albert Hood's internal organs. Specifically, this bullet pierced Albert Hood's liver, right diaphragm, and kidneys. The injury [*sic*] Albert Hood received from the gunshot wounds were life-threatening. Without the medical attention he received at the University Medical Center, Albert Hood would have died."

It was further stipulated that Hood's injuries constituted great bodily injury for the purposes of the charged enhancements pursuant to sections 12022.7 and 12022.53, subdivision (d).

[Petitioner and Lopez] did not testify at trial.

(LD 4 at 5-10.)

## **PETITIONER'S CLAIMS**

1. Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated when he was sentenced to life imprisonment for willful, deliberate, and premeditated attempted murder despite the jury failing to find specifically the elements of willfulness, deliberation, and premeditation (Pet. 5-12);[4] and

2. Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated when he was found guilty of willful, deliberate, and premeditated attempted murder despite 1) the failure to present to the jury the elements of the crime, and 2) the jury's failure to find specifically the elements of willfulness, deliberation, and premeditation (Pet. 12).

///

---

[4] For ease of reference, the Court utilizes the CM/ECF pagination from the Petition.

5

**STANDARD OF REVIEW**

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of

the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11 (*quoting* 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537 U.S. at 24-25, 27. An "unreasonable application" is different from an "erroneous" or "incorrect" one. *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Woodford*, 537 U.S. at 25.

A state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

## DISCUSSION

### Claim One

In his first claim, Petitioner alleges his rights under the Fifth (due process), Sixth (right to jury trial and confrontation), and Fourteenth (equal protection) Amendments to the United States Constitution were violated when he was sentenced to life imprisonment for willful, deliberate, and premeditated attempted murder despite the jury failing to find specifically the elements of willfulness, deliberation, and premeditation. (Pet. 5-12.) Petitioner contends this is contrary to California Penal Code section 664(a), which states:

> Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts, as follows:
> (a) If the crime attempted is punishable by imprisonment in the state prison, the person guilty of the attempt shall be punished by imprisonment in the state prison for

>one-half the term of imprisonment prescribed upon a conviction of the offense attempted. However, if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. If the crime attempted is any other one in which the maximum sentence is life imprisonment or death, the person guilty of the attempt shall be punished by imprisonment in the state prison for five, seven, or nine years. *The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact.*

Cal. Penal Code § 664(a) (2006) (emphasis added). Petitioner bases his claim on the aforementioned emphasized portion of section 664.

Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). In rejecting Petitioner's claim, the court of appeal stated:

>With respect to his sentence on the attempted murder charge, [Petitioner] contends that it should be reduced to a determinate sentence of five, seven, or nine years because the jury did not specifically find that he possessed the requisite mental state of willfulness, deliberation, and premeditation. We disagree.
>Section 664, subdivision (a) provides in relevant part: "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. If the crime attempted is any other one in which the maximum sentence is life imprisonment or death, the person guilty of the attempt shall be punished by imprisonment in state prison for five, seven, or nine years. The additional term provided in this section ... shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (§ 664, subd. (a).)
>In *People v. Lee* (2003) 31 Cal.4th 613 (*Lee*), the California Supreme Court noted that "section 664(a) states *only* that the murder attempted must have been willful, deliberate, and premeditated, *not* that the attempted murderer *personally* must have acted willfully and with deliberation and premeditation." (*People v. Lee*, *supra*, 31 Cal.4th at p. 622.) The *Lee* court held that "section 664(a) properly must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally acted with willfulness, deliberation, and premeditation, even if he or she is guilty as an aider and abettor." (*Id.* at p. 627.)
>Here, the jury found that the principal, Lopez, committed the attempted murder willfully, deliberately and with premeditation, within the meaning of section 664, subdivision (a). According to the jury instruction on premeditation that was given, this finding meant the jury concluded that the attempted murder was done willfully and with premeditation and deliberation. The jury also found [Petitioner] guilty of aiding and abetting the attempted murder. Thus, even though there was no specific finding as to [Petitioner]'s mental state, the jury's finding that the attempted murder was willful, deliberate and premeditated renders [Petitioner] eligible for the enhanced sentence of life imprisonment provided for in section 664, subdivision (a).
>[Petitioner] contends that this case is distinguishable from *Lee* because in this case the jury never made a finding on the special allegation of willfulness, deliberation and premeditation as to [Petitioner]. We disagree that this renders the enhanced sentence erroneous. The jury did not have to find that [Petitioner] had the mental state of

8

willfulness, deliberation and premeditation to render him eligible for the enhanced sentence. As the *Lee* Court noted: "[T]he Legislature reasonably could have determined that an attempted murderer who is guilty as an aider and abettor, but who did not personally act with willfulness, deliberation, and premeditation, is sufficiently blameworthy to be punished with life imprisonment." (*Lee*, *supra*, 31 Cal.4th at p. 624.) Thus, under *Lee*, there was no error in sentencing.

(LD 4 at 21-23.)

"[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004); *see also Waddington*, 129 S. Ct. at 831. Rather, the question is whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (*quoting Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Where a claim of instructional error involves failure to give an instruction, the petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. An ambiguous or erroneous instruction is reviewed to determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violated the Constitution. *Estelle*, 502 U.S. at 72. The instruction must be considered in the context of the trial record and the instructions as a whole. *Id.* "Unless there is a likelihood that the jury applied the instructions in a way that lessens the prosecution's burden of proof, we review instructional error under the harmless error standard." *Mendez v. Knowles*, 556 F.3d 757, 768 (9th Cir. 2009) (*citing Hedgpeth v. Pulido*, 129 S. Ct. 530, 532 (2008)).

Preliminarily, to the extent that Petitioner challenges his sentence merely as a violation of California law, that claim is not cognizable on federal habeas corpus. *See* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68.

The Court agrees with the court of appeal's analysis. Here, the jury was given instructions as to willful, deliberate, and premeditated attempted murder with regard to Lopez, the perpetrator. (1 CT 241, 243-44.) The jury found that Lopez did commit willful, deliberate, and premeditated attempted murder. (2 CT 355.) The jury was also given instructions as to aiding and abetting with regard to Petitioner:

> To prove that the defendant [Petitioner] is guilty of a crime based on aiding and abetting that crime, the People must prove that:

9

> 1. The perpetrator committed the crime;
> 2. The defendant knew that the perpetrator intended to commit the crime;
> 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;
> AND
> 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
> Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and . . . he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. . . .

(1 CT 239.) The jury was instructed that a "person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it." (*Id.* 238.) Moreover, the jury was instructed on the elements of attempted murder (but not with willfulness, deliberation, and premeditation) as to Lopez *and* Petitioner. (*Id.* 241.) The jury subsequently found that Petitioner did commit willful, deliberate, and premeditated attempted murder. (2 CT 362.)

The Ninth Circuit has found that a defendant, as an aider and abettor to second-degree murder, was not required to have intended to encourage or facilitate the *particular offense* ultimately committed by the perpetrator; rather, his knowledge that an *act that was criminal was intended* and his action taken with the intent that the act was encouraged or facilitated were sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. *See Spivey v. Rocha*, 194 F.3d 971, 975-77 (9th Cir. 1999) (finding no due process violation) (*quoting People v. Beardslee*, 53 Cal. 3d 68, 90 (1991) (en banc)). Furthermore, as noted by the court of appeal, the California Supreme Court has stated "section 664(a) states *only* that the murder attempted must have been willful, deliberate, and premeditated, *not* that the attempted murderer *personally* must have acted willfully and with deliberation and premeditation." *People v. Lee*, 31 Cal. 4th 613, 622 (2003). The *Lee* court held that "section 664(a) properly must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally acted willfully and with deliberation and premeditation, *even if he or she is guilty as an aider and abettor*." *Id.* at 616 (emphasis added). A state court's interpretation of state law binds a federal court sitting in habeas corpus. *Bradshaw*, 546 U.S. at 76.

Here, 1) the instructions relating to Lopez of willful, deliberate, and premeditated attempted murder, 2) the instructions relating to Petitioner of aiding and abetting and attempted murder, and 3) the

jury's finding that Lopez committed willful, deliberate, and premeditated attempted murder, support the jury's finding that Petitioner committed willful, deliberate, and premeditated attempt murder. *See Spivey*, 194 F.3d at 975-77; *Lee*, 31 Cal.4th at 616, 622; *see also Solis v. Garcia*, 219 F.3d 922, 927-28 (9th Cir. 2000) (per curiam). Even assuming any ambiguous or erroneous instructions, Petitioner fails to show that "there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violated the Constitution. *Estelle*, 502 U.S. at 72. Petitioner does not show that failure to give an instruction "so infected the entire trial that the resulting conviction violates due process." *Id.*

For the foregoing reasons, the Court finds that the California courts' rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

**Claim Two**

In his second and final claim, Petitioner asserts that his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated when he was found guilty of willful, deliberate, and premeditated attempted murder despite 1) the failure to present to the jury the elements of the crime, and 2) the jury's failure to find specifically the elements of willfulness, deliberation, and premeditation. (Pet. 12.) Petitioner substantially duplicates his arguments from Claim One, *supra*, and as stated there, the jury was presented with the elements of aiding and abetting and attempted murder as to Petitioner, and willful, deliberate, and premeditated attempted murder as to Lopez. In addition, as stated in Claim One, *supra*, the jury's failure to find specifically the elements of willfulness, deliberation, and premeditation did not violate Petitioner's constitutional rights.

Accordingly, the Court finds that the California courts' rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

**Certificate of Appealability**

An applicant seeking to appeal a district court's dismissal of a habeas petition under 28 U.S.C. § 2254 must first obtain a certificate of appealability ("COA") from a district judge or circuit judge. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A judge should either grant the COA or state reasons why it should not issue, and the COA request should be decided by a district court in the first instance.

Fed. R. App. P. 22(b)(1); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

The applicant for a COA must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). A "substantial showing" is defined as a demonstration (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the issues differently; or (3) that issues are adequate to deserve encouragement to proceed further. *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see Slack*, 529 U.S. at 483-84 (stating that except for substituting the word "constitutional" for the word "federal," § 2253 codified the pre-AEDPA standard announced in *Barefoot v. Estelle*).

Where, as present here, a district court has rejected constitutional claims on their merits, the COA standard is straightforward. "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. The Court has reviewed the record of this case and finds that reasonable jurists would not find the Court's assessment of the constitutional claims debatable or wrong. On the merits of this case, reasonable jurists would not debate the constitutionality of Petitioner's conviction and sentence. Accordingly, the Court declines to issue a certificate of appealability.

## CONCLUSION AND ORDER

For the reasons discussed above, the Court DENIES the Petition for Writ of Habeas Corpus with prejudice and DECLINES to issue a certificate of appealability. The Clerk of Court is ORDERED to enter Judgment for Respondent and to close Case No. CV F 08-01745 LJO BAK HC.

IT IS SO ORDERED.

**Dated:   May 5, 2009**                    **/s/ Lawrence J. O'Neill**
                                            UNITED STATES DISTRICT JUDGE